UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION

JAMES DOMER BRENNER et al.,

        Plaintiffs,

v.                                CASE NO. 4:14-cv107-RH/CAS

RICK SCOTT, etc., et al.,

        Defendants.

_____/

SLOAN GRIMSLEY, et al.,

        Plaintiffs,

v.                                CASE NO. 4:14-cv138-RH/CAS

RICK SCOTT, etc., et al.,

        Defendants.

_____/

## MOTION FOR FILING OF *AMICI CURIAE* BRIEF

      Brenner Plaintiffs hereby move for entry of an order permitting them to file herein the *Brief of Amici Curiae* filed October 10, 2014 on behalf of the City of Tampa, City of St. Petersburg, City of Orlando, City of Miami Beach, City of Wilton Manors, Village of Biscayne Park, and Broward County in a pending case styled *Shaw v. Shaw,* in the Second District Court of Appeal for the State of Florida, Case No. 2D14-2384, in support of recognition of a same-sex marriage. A copy of the *Amici Curiae* Brief is attached.  Brenner Plaintiffs rely for their motion upon the matters set out in the following Memorandum in support of their motion.

## MEMORANDUM IN SUPPORT OF MOTION FOR FILING OF *AMICI* BRIEF

      The *Amici Curiae* Brief bears directly upon the contention urged by Defendants  herein that they stand for and represent the manifest will of the Florida electorate, citing the 2008 vote on the

constitutional amendment here under attack.  (Motion to Dismiss, p.2.)

That contention is now drawn sharply into question by the *Amici Curiae* Brief, by which in

2014 the City of Tampa, City of St. Petersburg, City of Orlando, City of Miami Beach, City of Wilton

Manors, Village of Biscayne Park, and Broward County all seek to be heard in support of

recognition of a same-sex marriage.  The entities in question obviously include a substantial portion

of Florida's population.

The *Amici* state in their brief,

> "*Amici* are a broad cross-section of Florida county and city governments that have
> individually resolved that marriage discrimination against lesbian, gay, bisexual, and
> transgender ("LGBT") people is inimical to our citizens' health and welfare, is
> detrimental to our efficiency and effectiveness as employers, and denies our tax
> payers hard-earned tourism revenue at a time when we can least afford it.  We write
> to aid the Court by setting forth the very real harm wrought by marriage inequality
> upon our citizens and upon our very legitimacy as governing bodies.  We have
> thoughtfully and deliberately arrived at this position." *(Amici* Brief, p. VIII.)

The *Amici Curiae* Brief is in and of itself an expression of the current will of the citizenry on

whose behalf it has been filed.  Plaintiffs should be as much entitled to have the *Amici Curiae* Brief

received and considered as counsel for Defendants have to claim that they speak the current will

of the people of Florida.

Brenner Plaintiffs recognize that this case may have been effectively resolved by the Order

Denying Motions to Dismiss and Granting a Preliminary Injunction.  That order, however, is being

appealed.  Brenner Plaintiffs accordingly believe they should continue to fill out the record as may

be appropriate until such time as finality has been achieved.

Respectfully Submitted,

Wm. J. Sheppard, Esquire
Florida Bar No.: 109154
Elizabeth J. White, Esquire
Florida Bar No.: 314560
Matthew R. Kachergus, Esquire

Florida Bar No.: 503282
Bryan E. DeMaggio, Esquire
Florida Bar No.: 055712
Jonathan W. Graessle, Esquire
Florida Bar No.: 102640
Sheppard, White & Kachergus, P.A.
215 Washington Street
Jacksonville, Florida 32202
Telephone: 904/356-9661
Facsimile:  904/356-9667
Email:      sheplaw@att.net
*COUNSEL FOR PLAINTIFFS*

Samuel S. Jacobson, Esquire
Florida Bar No.: 039090
Bledsoe, Jacobson, Schmidt,
  Wright, Wilkinson & Sussman
1301 Riverplace Boulevard
Suite 1818
Jacksonville, Florida 32207
*CO-COUNSEL FOR PLAINTIFFS*

## CERTIFICATE OF SERVICE

I hereby certify that on July 21st, 2014, I electronically filed the foregoing with the Clerk of the Court by using CM/ECF System which will send a notice of electronic filing to the following:

Allen C. Winsor, Esquire
Adam S. Tanenbaum, Esquire
Florida Attorney General
The Capitol PL-01
Tallahassee, FL  32399-1050

Daniel Boaz Tilley, Esquire
Maria Kayanan, Esquire
ACLU Foundation of Florida, Inc.
4500 Biscayne Blvd., Suite 340
Miami, FL   33137

Stephen F. Rosenthal, Esquire
Podhurst Orseck, P.A.
25 West Flagler St., Suite 800
Miami, FL 33130

James Jeffery Goodman, Jr., Esquire
Jeff Goodman, P.A.
935 Main Street
Chipley, FL 32428

Horatio G. Mihet, Esquire
Liberty Counsel
Post Office Box 540774
Orlando, FL 32854

Stephen C. Emmanuel, Esquire
Ausley & McMillen
123 South Calhoun Street
Tallahassee, FL 32301

Filing # 19281439 Electronically Filed 10/10/2014 06:57:23 PM

# IN THE SECOND DISTRICT COURT OF APPEAL
# STATE OF FLORIDA

## CASE NO. 2D14-2384
## L.T. Case No.: 14-DR-0666

---

MARIAMA MONIQUE CHANGAMIRE SHAW,
*Appellant-Petitioner*,

v.

KEIBA LYNN SHAW,
*Appellee-Respondent*.

---

ON APPEAL FROM THE CIRCUIT COURT
OF THE THIRTEENTH JUDICIAL CIRCUIT
HILLSBOROUGH COUNTY, FLORIDA

---

## BRIEF OF *AMICI CURIAE*

## CITY OF TAMPA, CITY OF ST. PETERSBURG, CITY OF ORLANDO, CITY OF MIAMI BEACH, CITY OF WILTON MANORS, VILLAGE OF BISCAYNE PARK, AND BROWARD COUNTY

## IN SUPPORT OF RECOGNITION OF THE PARTIES' MARRIAGE

RAUL J. AGUILA, CITY ATTORNEY
CITY OF MIAMI BEACH
1700 Convention Center Drive, 4th Floor
Miami Beach, Florida 33139
Telephone: (305) 673-7470
Facsimile: (305) 673-7002

By:  s/Robert F. Rosenwald, Jr.
ROBERT F. ROSENWALD, JR.
robertrosenwald@miamibeachfl.gov
Florida Bar No. 0190039
NICHOLAS E. KALLERGIS
nickkallergis@miamibeachfl.gov
Florida Bar No. 0105278

*Counsel for Amici Curiae*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................... ii

IDENTITY AND INTEREST OF *AMICI CURIAE* ............................................ viii

SUMMARY OF ARGUMENT .................................................................... 1

ARGUMENT ................................................................................ 1

I.   MARRIAGE INEQUALITY HARMS OUR RESIDENTS, IMPEDES
     OUR EFFECTIVENESS, AND ERODES OUR LEGITIMACY .................. 1

     A. Marriage Inequality Brings Legal and Financial Harm to
        Families ..................................................................... 2

     B. Marriage Inequality Brings Psychological Harm ....................... 7

II.  MARRIAGE INEQUALITY HARMS US AS EMPLOYERS ...................... 9

     A. We Work Hard to Provide a Nondiscriminatory Workplace ................... 10

     B. Marriage Inequality Presents Unique Challenges ..................... 11

        1.  The Marriage Ban Imposes Significant Administrative
            Burdens ................................................................ 11

        2.  Our Best Efforts Still Impose Stigma and Confusion Among
            Employees ............................................................. 13

III. MARRIAGE INEQUALITY DENIES OUR TAXPAYERS HARD-
     EARNED TOURISM REVENUE ............................................... 13

CONCLUSION ............................................................................. 15

CERTIFICATE OF SERVICE ............................................................... 17

CERTIFICATE OF COMPLIANCE ........................................................... 20

i

## TABLE OF AUTHORITIES

### Cases

Brown v. Bd. of Educ.,
   347 U.S. 483 (1954).................................................................2

Goodridge v. Dep't of Pub. Health,
   798 N.E.2d 941 (Mass. 2003)..............................................3

In re Marriage Cases,
   183 P.3d 384 (Cal. 2008)......................................................3

United States v. Windsor,
   133 S. Ct. 2675 (2013)..........................................................3

### Local Ordinances

Biscayne Park Village Charter § 7.07.................................... xii

Biscayne Park Village Code § 2-47 ................................. xii, 11

Biscayne Park Village Code § 2-48 ................................. xii, 12

Broward County Code, ch. 16 ½, art. VIII ................... xii, 11, 12

Broward County Code §§ 16½-21 to -23 ............................ xii

Broward County Code §§ 16½-33 to -33.1 ..................... xii, 11

Broward County Code §§ 16½-34 to -34.1 ......................... xii

Broward County Code §§ 16½-35 to -35.6 ......................... xii

Broward County Code § 16½-157 ................................. xii, 11

Miami Beach City Code § 2-373 .................................... xi, 11

Miami Beach City Code § 62-33 ...................................... xi, 1

Miami Beach City Code § 62-34 to -37................................................................xi

Miami Beach City Code § 62-86 to -91...........................................................xi, 11

Miami Beach City Code § 62-128 ...................................................................xi, 12

Miami Beach City Code §§ 62-161 to -164.....................................................xi, 11

Miami Beach City Code § 78-34 .........................................................................12

Orlando City Code §§ 57.01-14.5.........................................................................x

Orlando City Code § 57.08....................................................................................x

Orlando City Code § 57.09....................................................................................x

Orlando City Code § 57.14...............................................................................x, 11

Orlando City Code § 57.48-78..............................................................................x

Orlando City Code § 57.80-86..........................................................................x, 11

St. Petersburg City Code §§ 15-31 to -37.........................................................x, 11

St. Petersburg City Code § 17.5-23......................................................................x

Tampa City Code § 12-5.......................................................................................ix

Tampa City Code § 12-26..................................................................................ix, 11

Tampa City Code § 12-64.....................................................................................ix

Tampa City Code § 12-81 to -85 .........................................................................ix

Tampa City Code § 12-120 to -127...................................................................ix, 11

Wilton Manors City Code § 2-268(v) ..............................................................xi, 11

Wilton Manors City Code §§ 13.5-41 to -46............................................. xi, 11, 12

## Local Regulations

City of Orlando, *Employment & Recruitment,*
    *in Policies and Procedures* § 808.2.....................................................x

City of Orlando, *Harassment,*
    *in Policies and Procedures* § 808.26...............................................x, 9

City of St. Petersburg, *Equal Employment Opportunity and*
    *Affirmative Action Plan, in City of St. Petersburg*
    *Administrative Policy* No. 010501......................................................x

City of St. Petersburg, *Internal Complaints Related to Discrimination,*
    *Harassment, or Other Inappropriate Behavior, in Rules and*
    *Regulations of the Personnel Management System,*
    §§ 10-1 to -4........................................................................................x

City of Tampa, *Discriminatory Conduct,*
    *in City of Tampa Personnel Manual* § B1.2.....................................ix

City of Tampa, *Equal Opportunity,*
    *in City of Tampa Personnel Manual* § B1.1A...................................ix

City of Tampa, *Group Health Insurance,*
    *in City of Tampa Personnel Manual* § B22.1...............................ix, 12

City of Wilton Manors, *The Federal Family and Medical Leave Act –*
    *FMLA Policy, in Personnel and Safety Rules and Regulations,*
    *Civil Service Rules* § 10-9 ................................................................xi

## Local Resolutions

City of St. Petersburg, Proclamation of Mayor Rick Kriseman
    (June 12, 2014) ...........................................................................x, 11, 12

Village of Biscayne Park Resolution No. 2014-45.................................. xii

## Other Authorities

American Psychiatric Association, Position Statement, Support of
    Legal Recognition of Same-Sex Civil Marriage (2005) ...................................7

M.V. Lee Badgett, *Will Providing Marriage Rights to Same-Sex
    Couples Undermine Heterosexual Marriage?*, 1 Sexuality Res.
    & Soc. Pol'y 1 (2004) ..........................................................................4

M.V. Lee Badgett, Laura E. Durso, Angeliki Kastanis, & Christy
    Mallory, *The Business Impact of LGBT-Supportive Workplace
    Policies* 1, Williams Inst. (2013) ..................................................10

William C. Buffie, *Public Health Implications of Same-Sex Marriage*,
    101 Am. J. Pub. Health 986 (2011) ..................................................3

Erik H. Erikson, *Identity and the Life Cycle* (1959) ..................................7

E.G. Fitzgerald, Christy Mallory & M.V. Lee Badgett, *Estimating the
    Economic Boost of Marriage for Same-Sex Couples in Florida*,
    Williams Inst. (2014) ..........................................................................15

Gay and Lesbian Medical Association, *Same-Sex Marriage and
    Health* (2008)..............................................................3, 4, 5, 6, 7, 8

Gilbert Herdt & Robert Kertzner, *I do, but I can't: The impact of
    marriage denial on the mental health and sexual citizenship of
    lesbians and gay men in the United States*, 3 Sexuality Res. &
    Soc. Pol'y J. NSRC 33 (2006)...........................................4, 5, 7, 8, 9

Eric Holder, U.S. Attorney General, Attorney General Holder's
    Remarks at the Morgan State University Commencement
    Ceremony (May 19, 2014)..................................................................2

Email from Amy Iennaco, Chief Asst. City Att'y, Orlando, Fla., to
    Robert F. Rosenwald, Jr., Senior Asst. City Att'y, Miami
    Beach, Fla. (June 20, 2014, 13:03:00 EST) (on file with
    recipient) ..............................................................................................xi, 12

Richard Kim & Lisa Duggin, *Beyond Gay Marriage*, The Nation,
    June 29, 2005, http://www.thenation.com/article/beyond-gay-
    marriage ...........................................................................................................8

Janice Langbehn, Address at Family Equality Council Media Awards
    (October 13. 2007), *available at*
    http://webcache.googleusercontent.com/search?q=cache:-
    H3ot9UnNykJ:thelpkids.wordpress.com/keynote-
    speeches/+&cd=3&hl=en&ct= clnk&gl=us ...................................................5

Email from Christy Mallory, Senior Counsel, Williams Institute, to
    Robert F. Rosenwald, Jr., Senior Asst. City Att'y, Miami
    Beach, Fla. (June 13, 2014, 3:36:00 EST) (on file with
    recipient) ........................................................................................................10

Margaret Mead, *What is Happening to the American Family?*, 1
    Pastoral Psychology 40 (1950) ........................................................................7

Katherine A. O'Hanlan, *Health Policy Considerations for Our Sexual
    Minority Patients*, 107 Obstetrics & Gynecology 709 (2006) ........................6

C.J. Patterson & L.V. Friel, *Sexual Orientation and Fertility, in
    Infertility in the modern world: Biosocial perspectives* (G.
    Bentley and N. Mascie-Taylor, eds., 2000).....................................................5

James Pawelski, et al., Special Article, *The Effects of Marriage, Civil
    Union, and Domestic Partnership Laws on the Health and
    Well-Being of Children*, 118 Pediatrics 349 (2006), *available at*
    http://pediatrics.aappublications.org/content/118/1/349.full.pdf
    +html ...........................................................................................................5, 6

Catherine E. Ross, et al., *The Impact of the Family on Health: The
    Decade in Review*, 52 J. Marriage & Fam. 1059 (1990)................................8

Virgina Rutter & Pepper Schwartz, *The Gender of Sexuality: Exploring Sexual Possibilities* (2006) ............................................................4

Hannah Sampson, *Miami-Beach, Fort Lauderdale Offer Two New Options for Gay Tourists*, Miami Herald, Jan. 10, 2011, http://www.miamiherald.com/2011/01/10/2009627/miami-beach-fort-lauderdale-feature.html ...........................................14

Tara Siegel Bernard, *A Progress Report on Gay Employee Health Benefits*, N.Y. Times, Dec. 5, 2012, http://bucks.blogs.nytimes.com/2010/12/14/a-progress-report-on-gay-employee-health-benefits/ ..............................................13

Peggy Thoits, *Stress, Coping, and Social Support Processes: Where Are We? What Next?*, J. Health & Soc. Behav. (Special Issue) 53 (1995) ...........................................................................8

Tourism, Culture, and Economic Development Department, City of Miami Beach, Miami Beach Economic Indicators (2012), *available at* http://miamibeachfl.gov/WorkArea/linkit.aspx?LinkIdentifier=id&ItemID=65252 ...............................................14

U.S. Office of Pers. Mgmt., *Grossing Up Awards: Why and Why Not*, http://www.opm.gov/policy-data-oversight/performance-management/performance-management-cycle/rewarding/grossing-up-awards/ ........................................12

Visit Florida, *About VISIT FLORIDA*, http://www.visitflorida.com/en-us/about-visit-florida.html (last visited Oct. 9, 2014) ..................................14

Linda Waite & Maggie Gallagher, *The Case for Marriage: Why Married People are Happier, Healthier, and Better Off Financially* (2000) ...........................................................7, 8

Cathleen Zick & Ken Smith, *Marital Transitions, Poverty, and Gender Differences in Mortality*, 53 J. Marriage & Fam. 327 (1991) ...........................................................................8

## IDENTITY AND INTEREST OF *AMICI CURIAE*

*Amici* are a broad cross-section of Florida county and city governments that have individually resolved that marriage discrimination against lesbian, gay, bisexual, and transgender ("LGBT") people is inimical to our citizens' health and welfare, is detrimental to our efficiency and effectiveness as employers, and denies our taxpayers hard-earned tourism revenue at a time when we can least afford it. We write to aid the Court by setting forth the very real harm wrought by marriage inequality upon our citizens and upon our very legitimacy as governing bodies. We have thoughtfully and deliberately arrived at this position. We have prohibited discrimination in employment, housing, and public accommodations against lesbians and gay men within our jurisdictions. We have created boards or committees to hear complaints of unlawful discrimination, including discrimination against LGBT people, so that the promise of nondiscrimination is made real for our residents and visitors. We have established domestic partnership registries in an attempt to provide whatever substitute we can to our same-sex couples who are denied the stability and recognition that come automatically with civil marriage in Florida. We provide benefits to the domestic partners of our employees so that these families can rely upon health insurance and leave policies that otherwise would be denied them. Some of us require that our contractors provide equal benefits to domestic partner couples and at least one of us pays the

extra federal income tax levied upon unmarried same-sex couples that married straight couples do not have to pay when purchasing group health insurance. We take these steps because it is the right thing to do. But we also recognize that the continuing viability of our democracy and our society depends upon a well-justified belief by our people that we govern based upon the transparent and fair application of laws that apply to all equally.

    *Amici* are comprised of the following Florida governmental entities:

**The City of Tampa** ("Tampa"), through its Mayor Bob Buckhorn and with the concurrence of the Tampa City Council, has authorized the Tampa City Attorney to join in the submission of this brief and describe the efforts by Tampa to assure equality among its citizens. Tampa's Human Rights Ordinance prohibits discrimination in employment, public accommodations, and housing.[1] Tampa maintains a domestic partnership registry and provides health benefits to the domestic partners of its employees.[2] Tampa created a Human Rights Board to hear and initiate complaints of discrimination under Tampa's Human Rights Ordinance, and granted the board the power to review determinations of reasonable cause by the city's administration.[3] Tampa also boasts comprehensive protections for LGBT individuals in its personnel rules: Tampa's Equal Opportunity Policy requires equal treatment of all persons and equal opportunity in employment, and prohibits discrimination, inappropriate behavior, or harassment based on sexual orientation.[4] Lastly, Tampa requires its employees to provide services to the public without regard to the person's sexual orientation.[5]

---

[1] Tampa City Code § 12-26 (employment); § 12-64 (public accommodations); and 12-81 to -85 (housing).

[2] Tampa City Code §§ 12-120 to -127 (domestic partnership registry); City of Tampa, *Group Health Insurance, in City of Tampa Personnel Manual* § B22.1 (equal benefits for domestic partners of city employees).

[3] Tampa City Code § 12-5.

[4] City of Tampa, *Equal Opportunity, in City of Tampa Personnel Manual* § B1.1A; *Discriminatory Conduct, in City of Tampa Personnel Manual* § B1.2.

[5] *Id.*

**The City of St. Petersburg** ("St. Petersburg") enacted a Domestic Partnership Registry Ordinance in 2012.[6] In its Equal Employment Opportunity & Affirmative Action Plan, St. Petersburg prohibits discrimination in "recruitment, examination, training, promotion, retention, or any other personnel action because of . . . sexual orientation."[7] St. Petersburg provides a comprehensive procedure for filing complaints of discrimination with the city's Human Resources Department.[8] St. Petersburg prohibits discrimination in the city's housing assistance program.[9] St. Petersburg has a Mayoral LGBT Liaison and Police LGBT Liaison.[10] Lastly, St. Petersburg encourages vendors and contractors to adopt anti-discrimination policies and to provide workplaces free of sexual orientation discrimination in terms and conditions of employment, including benefits.[11] St. Petersburg's Mayor and City Council voted on September 4, 2014, to submit this *amicus curiae* brief.

**The City of Orlando** ("Orlando") broadly prohibits discrimination in employment, housing, public accommodations, and lending, in its City Code.[12] Orlando's Chapter 57 Review Board is charged, among other things, with protecting the civil rights of its LGBT citizens and hearing complaints of discrimination.[13] Orlando prohibits discrimination against city employees, and includes sexual orientation and gender identity as protected classes in its anti-harassment policy.[14] Orlando also maintains a domestic partner registry and protects the rights of domestic partners with regard to healthcare visitation and decisions, funeral and burial decisions, correctional facility visitation, mandatory notification of family members, preneed guardian designation, and education.[15] Orlando has offered health benefits to its employees' same-sex domestic partners

---

[6] St. Petersburg City Code §§ 15-31 to -37.

[7] City of St. Petersburg, *Equal Employment Opportunity and Affirmative Action Plan, in City of St. Petersburg Administrative Policy* No. 010501.

[8] City of St. Petersburg, *Internal Complaints Related to Discrimination, Harassment, or Other Inappropriate Behavior, in Rules and Regulations of the Personnel Management System* §§ 10-1 to -4.

[9] St. Petersburg City Code § 17.5-23.

[10] City of St. Petersburg, Proclamation of Mayor Rick Kriseman (June 12, 2014).

[11] *Id.*

[12] Orlando City Code § 57.14 (employment); §§ 57.48-78 (housing); § 57.08 (public accommodations); § 57.09 (lending).

[13] Orlando City Code §§ 57.01-14.5.

[14] City of Orlando, *Employment & Recruitment, in Policies and Procedures* § 808.2; *Harassment, in Policies and Procedures* § 808.26.

[15] Orlando City Code § 57.80-86.

since 2009.[16] Orlando's Mayor and Council voted on June 23, 2014, to submit this amicus curiae brief.

**The City of Miami Beach** ("Miami Beach") is a hub of tourism and diversity for people from the United States and around the world. Miami Beach prohibits discrimination against LGBT people and has established a Human Rights Committee to hear charges of discrimination.[17] Miami Beach has established a domestic partner registry and provides employment benefits to domestic partners of employees and their children, mandates that Miami Beach's contractors provide these benefits to their employees, and Miami Beach reimburses ("grossing up") our employees who pay extra income federal income tax for domestic partner health insurance benefits.[18] Miami Beach's Mayor and Commission voted unanimously on June 11, 2014, to submit this *amicus curiae* brief.

**The City of Wilton Manors** ("Wilton Manors") maintains a domestic partnership registry and provides equal benefits to the domestic partners of its city employees.[19] Likewise, covered city contractors in Wilton Manors must provide equal benefits to the domestic partners of their employees.[20] City vendors and contractors are prohibited from discriminating against any person based on sexual orientation or marital status. Wilton Manors allows city employees to take military caregiver leave if a domestic partner of an employee requires care due to an injury or illness suffered while on active military duty.[21] Health insurance continuation coverage is guaranteed to the children and domestic partners of city employees if

---

[16] Email from Amy Iennaco, Chief Asst. City Att'y, Orlando, Fla., to Robert F. Rosenwald, Jr., Senior Asst. City Att'y, Miami Beach, Fla. (June 20, 2014, 13:03:00 EST) (on file with recipient).

[17] *See* Miami Beach City Code § 62-33 (declaring the City's policy against discrimination); §§ 62-34 to -37 (creating the Miami Beach Human Rights Committee); §§ 62-86 to -91 (prohibiting discrimination in employment, public accommodations, housing, and public services, as well as prohibiting retaliatory discrimination, coercion of discriminatory practices, and interference, obstruction, or prevention of compliance with the Miami Beach Human Rights Ordinance).

[18] Miami Beach City Code §§ 62-161 to -164 (domestic partnership registry); § 62-128(c) (equal benefits for domestic partners); § 2-373 (equal benefits for domestic partners of city contractors); § 62-128(d) (grossing up ordinance).

[19] Wilton Manors City Code §§ 13.5-41 to -46.

[20] Wilton Manors City Code § 2-268(v).

[21] City of Wilton Manors, *The Federal Family and Medical Leave Act – FMLA Policy, in Personnel and Safety Rules and Regulations, Civil Service Rules* § 10-9.

xi

they lose coverage because of the death of the employee, the employee's termination, divorce or legal separation of the employee, the employee's entitlement to Medicare benefits, or a dependent's loss of designation as a "dependent child" under the city's health plan.[22] The Mayor and City Commission of Wilton Manors voted on August 12, 2014, to submit this *amicus curiae* brief.

**The Village of Biscayne Park** ("Biscayne Park") prohibits discrimination based on sexual orientation, under its Village Charter.[23] Biscayne Park maintains a domestic partnership registry,[24] and provides equal benefits to the domestic partners of its village employees.[25] The Mayor and Village Council voted unanimously on July 1, 2014, to "support equal access to legal marriage for same-sex couples" and to oppose "laws and constitutional amendments that deny equal access to legal marriage for same-sex couples."[26]

**Broward County** has been at the forefront of promoting equality for LGBT individuals and has a long history of support for the rights of same-sex couples. As early as 1999, Broward provided domestic partner employment benefits to its employees[27] and required that County contractors provide benefits to domestic partners,[28] both on the same basis as they provide benefits to employees' spouses. More broadly, Broward prohibits discrimination based upon sexual orientation in employment, public accommodations, and real estate transactions, including lending,[29] and has created a Human Rights Board to enforce these provisions.[30] The Broward County Board of County Commissioners passed a resolution in support of marriage equality on August 12, 2014.

---

[22] *Id.*
[23] Biscayne Park Village Charter § 7.07.
[24] Biscayne Park Village Code § 2-47.
[25] Biscayne Park Village Code § 2-48.
[26] Village of Biscayne Park Resolution No. 2014-45.
[27] *See* Broward County Code, ch. 16½, art. VIII.
[28] Broward County Code § 16½-157.
[29] *See* Broward County Code §§ 16½-33 to -33.1 (employment); §§ 16½-34 to -34.1 (public accommodations); §§ 16½-35 to -35.6 (real estate).
[30] Broward County Code §§ 16½-21 to -23.

## SUMMARY OF ARGUMENT

Florida's prohibition on marriage for gay and lesbian couples impedes our ability to fulfill our core mission of providing for the health and welfare of our residents, thereby eroding the very legitimacy of our governments; interferes with the administration of our business as employers; and denies our taxpayers tourism revenue.

## ARGUMENT

### I.   Marriage Inequality Harms Our Residents, Impedes Our Effectiveness, and Erodes Our Legitimacy.

We are resolved that there is no greater threat to our sacred mission to protect the health and welfare of our citizens than the existence of invidious discrimination. As the Miami Beach Code makes clear,

> In the city, with its cosmopolitan population consisting of people of every race, color, national origin, religion, sex, intersexuality, gender identity, sexual orientation, marital and familial status, and age, some of them who are disabled as defined under section 62-31 hereof, there is no greater danger to the health, morals, safety and welfare of the city and its inhabitants than the existence of prejudice against one another and antagonistic to each other because of differences of race, color, national origin, religion, sex, intersexuality, gender identity, sexual orientation, marital and familial status, age, or disability. The city finds and declares that prejudice, intolerance, bigotry and discrimination and disorder occasioned thereby threaten the rights and proper privileges of its inhabitants and menace the very institutions, foundations and bedrock of a free, democratic society.[31]

The societal harm that comes from discrimination reaches its apex when

---

[31] Miami Beach City Code § 62-33.

1

institutionalized as laws that serve no purpose other than to harm one segment of the population; discrimination is never more harmful than when the government itself discriminates. Attorney General Eric Holder recounted his own experience with state-sponsored racial discrimination as he announced that the federal government would no longer treat gay couples as less than equal to straight couples: "[A]lthough the vestiges of state-sanctioned discrimination affected many aspects of our lives – and continue to reverberate across the country even today – thanks to *Brown* and those who made it possible, your generation will never know a world in which 'separate but equal' was the law of the land."[32]

Florida's state-sanctioned discrimination compromises the health and welfare of our society and of our gay and lesbian citizens.

### A.      Marriage Inequality Brings Legal and Financial Harm to Families.

In the country's seminal decision on same-sex marriage, Massachusetts' highest court recognized that the denial of marriage rights to gays and lesbians is the purest form of institutionalized discrimination:

> The marriage ban works a deep and scarring hardship on a very real segment of the community for no rational reason.... The absence of any reasonable relationship between, on the one hand, an absolute disqualification of same-sex couples who wish to enter into civil marriage and, on the other, protection of public health, safety, or

---

[32] Eric Holder, U.S. Attorney General, Attorney General Holder's Remarks at the Morgan State University Commencement Ceremony (May 19, 2014) (citing *Brown v. Bd. of Educ.*, 347 U.S. 483 (1954)).

general welfare, suggests that the marriage restriction is rooted in persistent prejudices against persons who are (or who are believed to be) homosexual.[33]

The United States Supreme Court recently reaffirmed this rationale. In *United States v. Windsor*, 133 S. Ct. 2675, 2693 (2013), the Court stated, "The avowed purpose and practical effect of the law here in question [the Defense of Marriage Act] are to impose a disadvantage, a separate status, and so a stigma upon all who enter into same-sex marriages…."

Florida's ban on same-sex marriage, the plainest form of discrimination,[34] has a tremendous negative impact on the health and well-being of gay and lesbian couples and their children.[35] Florida denies these families the "aggregate of moral and social support [that] enables married people to more effectively negotiate the

---

[33] *Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941, 968 (Mass. 2003).

[34] *In re Marriage Cases*, 183 P.3d 384, 402 (Cal. 2008) ("Retaining the designation of marriage exclusively for opposite-sex couples and providing only a separate and distinct designation for same-sex couples may well have the effect of perpetuating a more general premise – now emphatically rejected by this state – that gay individuals and same-sex couples are in some respects 'second-class citizens' who may, under the law, be treated differently from, and less favorably than, heterosexual individuals or opposite-sex couples.").

[35] Gay and Lesbian Medical Association, Same-Sex Marriage and Health 3 (2008). A survey of 34,000 lesbian, gay, and bisexual individuals conducted in 2001 and 2002, and again in 2004 and 2005 after 14 states adopted constitutional bans on same-sex marriage, found "empirical evidence of the negative health effects of discriminatory policies relative to marriage equality." In the second study, "participants reported significantly higher rates of psychiatric disorders, with increases of 36% for any mood disorder, 248% for generalized anxiety disorder, 42% for alcohol use disorder, and 36% for psychiatric comorbidity." William C. Buffie, *Public Health Implications of Same-Sex Marriage*, 101 Am. J. Pub. Health 986, 987 (2011).

3

ordinary and extraordinary challenges that occur in social life, through the provision of a set of recurring advantages."[36]

The benefits of civil marriage include "spousal benefits, such as social security and public pensions; income tax benefits; inheritance, insurance, and survivorship rights including estate tax benefits, health insurance in spouses' group plans; the right to sue for wrongful death of a spouse; and power to make medical decisions on behalf of a spouse."[37] "More than 60 percent of insured Americans received health care through their own employer or that of their spouse or other family member."[38] Currently, same-sex couples are barred from "the full range of legal, economic, social, and mental health benefits provided by marriage. Legal recognition short of marriage is not transportable across state lines and subjects lesbians and gay men to the vicissitudes of local law and law enforcement."[39]

A stark illustration of this devastating harm can be found right here at home: In February 2007, Janice Langbehn, her long term partner Lisa Pond, and their three adopted children were in Miami to take a cruise. Pond suffered a brain

---

[36] Gilbert Herdt & Robert Kertzner, *I do, but I can't: The impact of marriage denial on the mental health and sexual citizenship of lesbians and gay men in the United States*, 3 Sexuality Res. & Soc. Pol'y J. NSRC 33, 38 (2006).

[37] *Id.* (citing Virginia Rutter & Pepper Schwartz, *The Gender of Sexuality: Exploring Sexual Possibilities* (2006)).

[38] Gay and Lesbian Medical Association, *supra* note 35, at 6 (citing Herdt & Kertzner, *supra* note 36; M.V. Lee Badgett, *Will Providing Marriage Rights to Same-Sex Couples Undermine Heterosexual Marriage?*, 1 Sexuality Res. & Soc. Pol'y 1, 8 (2004)).

[39] *Id.*

4

aneurysm and was admitted to Jackson Memorial Hospital. The hospital, after telling Langbehn that she was "in an anti-gay city and state," refused to allow Langbehn and the couples' children to be with Pond, despite having received a durable power of attorney and advance directive. Pond died alone without her family present.[40]

While the dignity of marriage would empower couples like Janice Langbehn and Lisa Pond to make end-of-life decisions, the protective power of marriage might have served their children even more. Marriage equality would concretely promote the health and well-being of the many Florida children currently raised by gay and lesbian couples.[41] Marriage inequality undermines the stability of families raised by gay or lesbian couples, and "perpetua[tes] false claims about [their] parental fitness."[42] On the other hand, the legal recognition of a same-sex relationship "can increase the ability of adult couples to provide and care for one another and fosters a nurturing and secure environment for their children."[43]

---

[40] *Id.* at 10 (citing Janice Langbehn, Address at Family Equality Council Media Awards (October 13. 2007), *available at* http://webcache.googleusercontent.com/search?q=cache:-H3ot9UnNykJ:thelpkids.wordpress.com/keynote-speeches/+&cd=3&hl=en&ct=clnk&gl=us).

[41] *Id.* at 7 (citing C.J. Patterson & L.V. Friel, *Sexual Orientation and Fertility, in Infertility in the modern world: Biosocial perspectives* 238 (G. Bentley and N. Mascie-Taylor, eds., 2000)).

[42] *Id.* (citing Herdt & Kertzner, *supra* note 36).

[43] *Id.* (citing James Pawelski, et al., Special Article, *The Effects of Marriage, Civil Union, and Domestic Partnership Laws on the Health and Well-Being of Children,*

Children of Florida same-sex couples are currently denied rights and privileges enjoyed by children of legally married couples, like "survivorship rights and protections, recognition of parental rights and responsibilities, tax and other financial advantages, and legal protections to partners and children during the dissolution of relationships."[44] These rights are basic benefits of civil marriage, and should be extended to same-sex couples who wish to marry. Instead, children of same-sex parents suffer economic, legal, and familial insecurity.[45] Without the legal protections of civil marriage, "same gender couples' death, disability, and divorce disputes are relegated to civil courts, which apply contract or business law, but not family law, such that children's concerns are ignored."[46]

Society's ability to care for another group of its most vulnerable citizens is compromised by Florida's same-sex marriage ban: the elderly. The American Psychiatric Association recognizes the effect of marriage discrimination on aging:

> As the population ages, the denial of legal recognition of civil marriage has consequences for increasing numbers of older adults in same-sex relationships who face age-related health and financial concerns. Excluding these adults from civil marriage protections of survivorship and inheritance rights, financial benefits, and legal recognition as a couple in healthcare settings increases the

---

118 Pediatrics 349 (2006), *available at* http://pediatrics.aappublications.org/content/118/1/349.full.pdf+html).

[44] *Id.*

[45] *Id.*

[46] *Id.* (citing Katherine A. O'Hanlan, *Health Policy Considerations for Our Sexual Minority Patients*, 107 Obstetrics & Gynecology 709 (2006)).

psychological burden associated with aging.[47]

Marriage provides a socially and legally recognized "context for individuals to realize their capacities for love, care, and self-transcendence."[48] Marriage also "provides social legitimacy to the intimate bonds of adults and is required for the recognition of full adulthood across many cultures."[49] The denial of marriage equality reverberates from cradle to grave.

B.      **Marriage Inequality Brings Psychological Harm.**

In addition to legal and financial disadvantages, marriage discrimination wreaks psychological harm on family members of gay and lesbian couples. Gay and lesbian couples "face unusual and specific stressors due to the absence of social and legal rights and duties that define same-sex couplehood."[50] The American Psychiatric Association has recognized that "same-sex couples … experience several kinds of state-sanctioned discrimination that can adversely affect the stability of their relationships and their mental health."[51]

---

[47] *Id.* at 9 (citing Position Statement, American Psychiatric Association, Support of Legal Recognition of Same-Sex Civil Marriage (2005)).

[48] *Id.* at 5 (citing Herdt & Kertzner, *supra* note 36; Erik H. Erikson, *Identity and the Life Cycle* (1959)).

[49] *Id.* (citing Linda Waite & Maggie Gallagher, *The Case for Marriage: Why Married People are Happier, Healthier, and Better Off Financially* (2000); Margaret Mead, *What is Happening to the American Family?*, 1 Pastoral Psychology 40 (1950)).

[50] Herdt & Kertzner, *supra* note 36, at 40.

[51] Gay and Lesbian Medical Association, *supra* note 35, at 3 (citing American Psychiatric Association, *supra* note 47).

Hundreds of studies of straight couples have established that "married individuals have better mental health, more emotional support, less psychological distress, and lower rates of psychiatric disorders than unmarried individuals."[52] Marriage equality "may confer additional benefits because of the protective effects of relationships in countering discrimination and sexual prejudice."[53]

Married individuals report more emotional support and are more likely to have a close confidant than the unmarried.[54] Emotional support is directly associated with health and well-being and provides protection against the negative health consequences of stress.[55]

Many Americans relate their well-being to marriage,[56] which is widely perceived to bestow a variety of resources and benefits.[57] Married individuals report less economic strain and higher incomes than the unmarried.[58] For Americans who enjoy legal access to it, "marriage is uniquely associated with

---

[52] Herdt & Kertzner, *supra* note 36, at 35.

[53] Gay and Lesbian Medical Association, *supra* note 35, at 6.

[54] *Id.*

[55] *Id.* (citing Herdt & Kertzner, *supra* note 36; Peggy Thoits, *Stress, Coping, and Social Support Processes: Where Are We? What Next?*, J. Health & Soc. Behav. (Special Issue) 53 (1995)).

[56] *Id.* (citing Richard Kim & Lisa Duggin, *Beyond Gay Marriage*, The Nation, June 29, 2005, http://www.thenation.com/article/beyond-gay-marriage).

[57] *Id.* (citing Waite & Gallagher, *supra* note 49).

[58] *Id.* (citing Herdt & Kertzner, *supra* note 36; Catherine E. Ross, et al., *The Impact of the Family on Health: The Decade in Review*, 52 J. Marriage & Fam. 1059 (1990); Waite & Gallagher, *supra* note 49; Cathleen Zick & Ken Smith, *Marital Transitions, Poverty, and Gender Differences in Mortality*, 53 J. Marriage & Fam. 327 (1991)).

tangible and intangible benefits that are linked to and support psychological health."[59] In sum, the denial of marriage to lesbians and gay men is harmful to the health and welfare of our residents and is harmful to society at large.

## II.   Marriage Inequality Harms Us As Employers.

Our business is to provide world-class service to our residents and visitors. We employ large and diverse workforces, which perform functions ranging from that of City Manager to summer recreation counselors – everything needed to run multi-faceted organizations. It is only by our ability to attract and retain top-tier talent that we can live up to our promise. Orlando said it this way:

> The City of Orlando community has a population which is richly diverse. The effective provision of governmental services within such a diverse community requires the services of an equally diverse employee population. The City of Orlando is, therefore, committed to providing an employee workforce which, in all positions and at all levels, fairly reflects the community it serves. The City encourages all segments of its population to become involved with, and seek employment in, City government. To achieve this goal, it is the policy of the City of Orlando, binding on all officials and employees, to offer equal employment opportunity to all persons regardless of race, color, religion, sex, national origin, age, sexual orientation, or disability. The City will further take whatever steps are necessary to ensure that all employment practices, including, but not limited to, compensation, benefits, layoffs, promotions, training, terminations, hiring, and recruitment, are administered in a manner that provides full and fair opportunity to all persons.[60]

The Williams Institute at the University of California at Los Angeles School

---

[59] Herdt & Kertzner, *supra* note 36 at 36.
[60] City of Orlando, *Harassment, in Policies and Procedures* § 808.26.

9

of Law recently reviewed 36 research studies and found that working in an LGBT-supportive workplace climate resulted in "greater job commitment, improved workplace relationships, increased job satisfaction, improved health outcomes, and increased productivity" among LGBT employees.[61]

**A.    We Work Hard to Provide a Nondiscriminatory Workplace.**

In Florida, all 12 public universities in the state prohibit discrimination based on sexual orientation and nine prohibit discrimination based on gender identity. There are at least 28 localities that prohibit discrimination based on sexual orientation against their own government employees. Twenty localities also prohibit discrimination based on gender identity.[62]

A 2011 study found that 68 local governments in the United States require that their contractors have LGBT-supportive affirmative action policies, or policies granting same-sex domestic partners equal benefits.[63] We prohibit discrimination based upon sexual orientation and gender identity by covered employers doing

---

[61] M.V. Lee Badgett, Laura E. Durso, Angeliki Kastanis, & Christy Mallory, *The Business Impact of LGBT-Supportive Workplace Policies* 1, Williams Institute (2013) (*hereinafter* "Williams Institute"), *available at* http://williamsinstitute.law.ucla.edu/wp-content/uploads/Business-Impact-LGBT-Policies-Full-Report-May-2013.pdf.

[62] Email from Christy Mallory, Senior Counsel, Williams Institute, to Robert F. Rosenwald, Jr., Senior Asst. City Att'y, Miami Beach, Fla. (June 13, 2014, 12:36 EST) (on file with recipient).

[63] Williams Institute, *supra* note 61, at 21.

business in our jurisdictions.[64] We also encourage or require our covered contractors to provide domestic partner benefits on equal footing with those offered to married couples.[65]

### B.   Marriage Inequality Presents Unique Challenges.

Marriage discrimination by the state presents its own unique challenges for us to address. Although we attempt to lessen burdens on our employees, these efforts impose significant administrative burdens. While we provide near-equivalents to some of the benefits afforded to legally married couples, we are unable to erase the stain of inequality.

### 1.   The Marriage Ban Imposes Significant Administrative Burdens.

To alleviate the disparities in available benefits between gay and straight employee families, we provide comprehensive workarounds in an attempt to approximate marriage equality for our employees. First, we have all enacted a domestic partner registry that the public can use to register families for local recognition.[66] Second, we all provide benefits to registered domestic partners of

---

[64] Tampa City Code § 12-26; Orlando City Code § 57.14; Miami Beach City Code § 62-86; Broward County Code §§ 16½-33 to -33.1.

[65] City of St. Petersburg, Proclamation of Mayor Rick Kriseman (June 12, 2014); Miami Beach City Code § 2-373(b); Wilton Manors City Code § 2-268(v); Broward County Code § 16½-157.

[66] Tampa City Code §§ 12-120 to -127; St. Petersburg City Code §§ 15-31 to -37; Orlando City Code §§ 57.80-86; Miami Beach City Code §§ 62-161 to -164;

city employees.[67] Finally, Miami Beach reimburses employees for the additional federal income tax liability that domestic partners – but not legally married couples – incur when receiving benefits ("grossing up").[68]

Grossing up is a costly and complex process. To illustrate, a married employee who, through an employer, obtains health insurance for a spouse does not pay federal income tax on the value of the insurance obtained, but only if the employee's spouse is legally recognized. Many employers attempt to address taxability differences by reimbursing the employee to offset the tax impact of imputed healthcare benefits. Grossing up offsets the inequity created by Florida's discriminatory marriage law, but it imposes a pecuniary cost beyond the direct cost of paying for employee benefits.

The U.S. Office of Personnel Management, in a study of grossing up, noted that this approach "raises costs considerably.... Under a grossing up policy, a $1,000 net cash award would actually cost the agency $1,713.80."[69] The New York

---

Wilton Manors City Code §§ 13.5-41 to -46; Biscayne Park Village Code § 2-47; Broward County Code, ch. 16½, art. VIII.

[67] City of Tampa, *Group Health Insurance, in City of Tampa Personnel Manual* § B22.1; City of St. Petersburg, Proclamation of Mayor Rick Kriseman (June 12, 2014); Email from Amy Iennaco, *supra* note 16; Miami Beach City Code § 78-34; Wilton Manors City Code § 13.5-45; Biscayne Park Village Code § 2-48; Broward County Code, ch. 16½, art. VIII.

[68] Miami Beach City Code § 62-128(d).

[69] U.S. Office of Pers. Mgmt., *Grossing Up Awards: Why and Why Not,* http://www.opm.gov/policy-data-oversight/performance-management/performance -management-cycle/rewarding/grossing-up-awards/   (using   the   following

Times estimates that grossing up for an employee who incurred between $1,200 and $1,500 in extra taxes costs the employer between $2,000 and $2,500.[70]

Grossing up is also quite complicated. Tax rates, timing, and the taxation of the gross up amount itself all come into play. We must retain experts who craft the policies and structure systems that can record gross-up amounts, as well as educate human resources, benefits, and payroll administrators.

### 2. Our Best Efforts Still Impose Stigma and Confusion Among Employees.

Our workarounds – as well-intentioned and beneficial as they are – still perpetuate a stigma by according different treatment to those employees who were married out-of-state to a same-sex spouse or are barred from marriage by Florida law, as opposed to those who are legally married to a different-sex spouse. Rightly or wrongly, our employees see us as the enforcement mechanism for a discriminatory regime. Employee morale and productivity suffer as a result.

### III. Marriage Inequality Denies Our Taxpayers Hard-Earned Tourism Revenue.

Our local economies, like those of most of Florida, are heavily dependent upon domestic and international tourism. As the state's number one industry,

---

withholding rates: federal income tax, 28 percent; Medicare tax, 1.45 percent; Social Security tax, 6.2 percent; state income tax, 6 percent).

[70] Tara Siegel Bernard, *A Progress Report on Gay Employee Health Benefits*, N.Y. Times, Dec. 5, 2012, http://bucks.blogs.nytimes.com/2010/12/14/a-progress-report-on-gay-employee-health-benefits/.

tourism was responsible for welcoming 94.3 million visitors in 2013 who spent $76.1 billion, generating 23 percent of the state's sales tax revenue and employing nearly 1.1 million Floridians.[71] Miami Beach's tropical weather, thriving arts scene, multicultural populace, and booming nightlife drew a diverse international crowd of 5,293,722 tourists to the city in the last counted year. Tourism brings in more than $8 billion dollars annually and makes up a large percentage of Miami Beach's annual budget.[72] The South Florida region is also a favorite tourist destination for lesbians and gay men. Broward and Miami-Dade counties draw an estimated 2.15 million LGBT visitors a year who spend nearly $3 billion.[73]

The Williams Institute has determined that Florida would see an economic boost as same-sex couples plan their weddings, and as their out-of-state guests purchase goods and services in the state, in the first three years following the state's recognition of same-sex marriage. The authors of this study based their findings on information regarding marriage spending by same-sex couples in other states, along with wedding expenditure and tourism data from the State of Florida,

---

[71] Visit Florida, *About VISIT FLORIDA*, http://www.visitflorida.com/en-us/about-visit-florida.html (last visited Oct. 9, 2014).

[72] Tourism, Culture, and Economic Development Department, City of Miami Beach, Miami Beach Economic Indicators (2012), *available at* http://miamibeachfl.gov/WorkArea/linkit.aspx?LinkIdentifier=id&ItemID=65252.

[73] Hannah Sampson, *Miami-Beach, Fort Lauderdale Offer Two New Options for Gay Tourists*, Miami Herald, Jan. 10, 2011, http://www.miamiherald.com/2011/01/10/2009627/miami-beach-fort-lauderdale-feature.html.

14

to estimate the economic stimulus from the state's recognition of marriage equality. The study indicates that the total spending on wedding arrangements and tourism by same-sex couples and their guests would be approximately $182.2 million over three years, with a positive impact of $116.6 million in the first year alone. The total added economic activity over three years would generate about $12.1 million in tax revenue for state and local governments. Finally, marriage spending would directly account for the creation of up to 2,600 jobs in Florida.[74]

We spend significant public funds to attract tourists. Institutional discrimination that makes Florida a less attractive place to visit is directly contrary to the interests of our taxpayers and to society at large.

## CONCLUSION

Fair and transparent government is the cornerstone of our society. Florida's same-sex marriage ban compromises our ability to fulfill that promise. In addition to violating notions of constitutional government and basic fairness, the state's marriage ban keeps us from doing our job. The Court should recognize the marriage of Mariama Monique Changamire Shaw and Keiba Lynn Shaw, and the decision of the Circuit Court should be reversed.[75]

---

[74] E.G. Fitzgerald, Christy Mallory & M.V. Lee Badgett, Estimating the Economic Boost of Marriage for Same-Sex Couples in Florida, Williams Inst. (2014).
[75] Broward joins in the brief filed by *Amici Curiae* solely for the purpose of asking the Court to provide the relief requested and requesting it to take judicial notice of

15

Respectfully Submitted,

RAUL J. AGUILA, CITY ATTORNEY
CITY OF MIAMI BEACH
1700 Convention Center Drive, 4th Floor
Miami Beach, Florida 33139
Telephone: (305) 673-7470
Facsimile: (305) 673-7002

By:   s/Robert F. Rosenwald, Jr.
      ROBERT F. ROSENWALD, JR.
      First Assistant City Attorney
      robertrosenwald@miamibeachfl.gov
      Florida Bar No. 0190039
      NICHOLAS E. KALLERGIS
      Assistant City Attorney
      nickkallergis@miamibeachfl.gov
      Florida Bar No. 0105278

      *Counsel for Amici Curiae*

---

the County's ordinance granting equal benefits to same-sex couples and other
domestic partners as heterosexual married couples.

16

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court through the Florida Courts eFiling Portal to be served this 10th of October, 2014, on counsel of record listed below:

s/Robert F. Rosenwald
ROBERT F. ROSENWALD, JR.

## SERVICE LIST

| | |
|---|---|
| ELLEN E. WARE, ESQUIRE<br>600 S. Magnolia Ave., Ste. 225<br>Tampa, FL 33606<br>Telephone: (813)254-8500<br>attyware@tampabay.rr.com<br><br>BRETT R. RAHALL, ESQUIRE<br>120 South Willow Avenue<br>Tampa, Florida 33606<br>Telephone: (813) 258-8888<br>brett@brettrahall.com<br><br>BRIDGET REMINGTON, ESQURE<br>601 Bayshore Boulevard, Ste. 615<br>Tampa, FL 33606<br>Telephone: (813)440-2656<br>bridget.remington@hhpalaw.com<br>*Counsel for Appellant* | ADAM B. CORDOVER, ESQUIRE<br>adam@cordoverlaw.com<br>paralegal@cordoverlaw.com<br>**THE LAW FIRM OF ADAM B.**<br>**CORDOVER, P.A.**<br><br>DEBORAH L. THOMSON,<br>ESQUIRE<br>dthomson@thewomenslawgroup.com<br>scaudill@thewomenslawgroup.com<br>LARA G. DAVIS, ESQUIRE<br>ldavis@thewomenslawgroup.com<br>**THE WOMEN'S LAW GROUP,**<br>**P.L.**<br>*Counsel for Appellee* |
| ADAM S. TANENBAUM,<br>ESQUIRE<br>adam.tanenbaum@myfloridalegal.com<br>phyllis.thomas@myfloridalegal.com<br>adam.tanenbaum1@gmail.com<br>ALLEN WINSOR, ESQUIRE<br>allen.winsor@myfloridalegal.com<br>allenwinsor@yahoo.com<br>**OFFICE OF THE FLORIDA**<br>**ATTORNEY**<br>**GENERAL** | CYNTHIA L. GREENE, ESQUIRE<br>LISETTE GONZALEZ, ESQUIRE<br>gspa@greenesmithlaw.com<br>clg@greenesmithlaw.com<br>yv@greenesmithlaw.com<br>**GREENE SMITH &**<br>**ASSOCIATES, P.A.** |

| | |
|---|---|
| CHRISTOPHER RUMBOLD, ESQUIRE<br>service@gwpa.com<br>**GLADSTONE & WEISSMAN** | ROBERT ROSENWALD, ESQUIRE<br>robertrosenwald@miamibeachfl.gov<br>yamilexmorales@miamibeachfl.gov<br>NICHOLAS E. KALLERGIS, ESQUIRE<br>nickkallergis@miamibeachfl.gov<br>**CITY OF MIAMI BEACH** |
| KERRY EZROL, ESQUIRE<br>kezrol@cityatty.com<br>**GOREN CHEROF DOODY & EZROL, P.A.**<br>*Counsel for the City of Wilton Manors* | AMY IENNACO, ESQUIRE<br>amy.iennaco@cityoforlando.net<br>tracey.duffield@cityoforlando.net<br>**CITY OF ORLANDO** |
| JONI ARMSTRONG COFFEY, ESQUIRE<br>jacoffey@broward.org<br>MARK JOURNEY, ESQUIRE<br>mjourney@broward.org<br>**BROWARD COUNTY** | MARK WINN, ESQUIRE<br>mark.winn@stpete.org<br>JEANNINE WILLIAMS, ESQUIRE<br>jeannine.williams@stpete.org<br>**CITY OF ST. PETERSBURG** |
| JULIA MANDELL, ESQUIRE<br>Julia.Mandell@tampagov.net<br>ROBIN HORTON-SILVERMAN, ESQUIRE<br>Robin.Horton-Silverman@tampagov.net<br>**CITY OF TAMPA** | JOHN HEARN, ESQUIRE<br>attyhearn@aol.com<br>*Counsel for the Village of Biscayne Park* |

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that this brief is submitted in Times New Roman 14-point font and complies with the font requirements of Rule 9.210(a)(2), Florida Rules of Appellate Procedure.

s/Robert F. Rosenwald, Jr.
ROBERT F. ROSENWALD, JR.